## LICENSE AGREEMENT

This LICENSE AGREEMENT (this "Agreement") is effective as of January 1, 2009 between WORLD WRESTLING ENTERTAINMENT, INC., a Delaware corporation with offices at 1241 East Main Street, Stamford, Connecticut 06902 (hereafter referred to as the "WWE"), and SOLAR ENTERTAINMENT CORPORATION, with its place of business at 10/Flr Century Tower Building, 100 Tordessillas St. corner HV dela Costa St., Salcedo Village, Makati City, 1227 Philippines (hereafter referred to as the "Operator").

### PREMISES

WHEREAS, WWE owns the rights to televise certain professional wrestling events, produced, sponsored and/or promoted by WWE (collectively "Event(s)") and WWE intends to transmit and license to Operator (i) certain Events on a pay-per-view basis (the "Pay-Per-View Programs") by generating and transmitting a television signal carrying the Event(s) throughout the Philippines (the "Territory"); and (ii) certain other Events as more particularly described in Schedule A, the "Special Programs" for broadcast via pay services television throughout the Territory (the Special Programs and the Pay-Per View Programs, collectively, the "Programs");

WHEREAS, Operator currently provides pay-per-view services within the Territory via cable and satellite and other television service via cable, satellite and terrestrial television and, to the extent linear and simultaneous with the other television distribution, digital terrestrial and internet protocol television through certain platforms now known as Jack TV (collectively "Operator's Distribution Services"); and

WHEREAS, WWE and Operator desire that Operator receive and exhibit to subscribers within the Territory via Operator's Distribution Services (i) the Pay-Per-View Programs on a pay-per-view basis and (ii) the Special Programs, on a pay television basis; in each case as listed on Schedule A and in accordance with the terms hereof.

NOW THEREFORE, for the mutual promises and covenants contained herein and for other good and valuable consideration, WWE and Operator agree as follows:

1.0   PAY-PER-VIEW PROGRAM LICENSE:  WWE hereby licenses to Operator, on a limited but exclusive basis (to the extent provided in Section 1.4 below), during the Term and within the Territory the right to exhibit the Pay-Per-View Programs via Operator's Distribution Services to Operator's Subscribers (as defined below), in accordance with the following conditions and restrictions:

1.1   For purposes hereof, "Subscriber" shall mean addressable residential subscribers for personal and private viewing in residential premises within the Territory who pay a pay per view fee to Operator in order to view a Pay-Per-View Program, including but not limited to, individual homes and individual residences in multiple dwelling units and homes. Subscribers shall not include any entities or individuals who subscribe to a Pay-Per-View Program and exhibit the Pay-Per-View

Program in a commercial premises, which is  defined below by way of example and not limitation as follows:

      (a) any subscribers or subscriber locations open to the public at large;

      (b) any subscribers or subscriber locations in hotels, motels or other place of transient residence;

      (c) any subscribers operating commercial establishments, such as restaurants, bars, theatres or other facilities for public entertainment and amusement;

      (d) any subscribers charging an admission fee for watching the Pay-Per-View Program; or

      (e) any military bases or sites of other governmental entities.

      1.2     Without prior written consent of WWE, Operator shall not by any means whatsoever duplicate, copy, record or transcribe the Pay-Per-View Programs, except that Operator may make one (1) copy of the live satellite feed in order to have available a back-up recording of each Pay-Per-View Program for use in transmitting the replays indicated on Schedule A (the "Replays"). Once the Replays of each Pay-Per-View Program are completed, the back-up recording shall be completely erased or otherwise destroyed.

      1.3     This Agreement strictly prohibits any and all knowing acts of commission or omission on the part of Operator which would permit or facilitate the cablecasting and exhibition of the Pay-Per-View Programs to anyone other than Operator's Subscribers, as specifically defined herein, and Operator shall not, for any reason whatsoever, knowingly open the television signal carrying the Pay-Per-View Programs to any other subscribers, unless all have agreed to pay the fee for watching the Pay-Per-View Programs on their residential television sets and thereby fall within the definition of Subscribers (save for reasons beyond the control of Operator).  This Agreement shall in no way whatsoever license Operator to exhibit, transmit or otherwise exploit any Pay-Per-View Program via the Internet or personal computer or through any other medium (whether now in existence or hereafter created), except for via Operator's Distribution Services, as said distribution services are now known.

      1.4     This License does not convey, sell, lease or assign to Operator any rights and/or interests, whatsoever, in or to the Pay-Per-View Programs.  WWE may exhibit the applicable Programs via all methods of exhibition, transmission or exploitation in any manner whatsoever (whether now known or discovered in the future and including, without limitation, via mobile telephones and the Internet), which are entirely and exclusively reserved to WWE for exploitation as it shall determine in its sole discretion subject to the following limitations; (i) WWE shall not license any Pay-Per-View Program in the Territory for pay, free, pay-per-view, SVOD, VOD or other television exhibition for a period of 14 days from the first showing of such Pay-Per-View Program hereunder; and (ii) in the event that WWE wishes to license to a third party the distribution of the Pay-Per-View Programs in their entirety via (a) the Internet (i.e., other than through WWE.com), or (b) via mobile or broadband, it will provide Operator notice thereof and, for a period of 30 days from

such notice shall negotiate exclusively with Operator with respect to such rights, it being agreed that nothing herein shall obligate any party to enter into any agreement with respect to such rights.

2.0     SPECIAL PROGRAMS LICENSE:   WWE hereby licenses to Operator, on a limited but exclusive basis (to the extent provided in Section 2.2 below) during the Term and within the Territory the right to exhibit the "Special Programs", which shall mean the WWE programming titles broadcast in sequential order as further set forth in Schedule A hereto.

2.1     Without prior written consent of WWE, Operator shall not by any means whatsoever duplicate, copy, record or transcribe Special Programs, except that Operator may make one (1) copy of the live satellite feed in order to have available a back-up recording of each Special Program for use in transmitting the replays indicated on Schedule A (the "Replays"). Once the Replays of each Special Program are completed, the back-up recording shall be completely erased or otherwise destroyed.

2.2     This License does not convey, sell, lease or assign to Operator any rights and/or interests, whatsoever, in or to the Special Programs.  WWE may exhibit the applicable Programs via all methods of exhibition, transmission or exploitation in any manner whatsoever (whether now known or discovered in the future and including, without limitation, via mobile telephones and the Internet), which are entirely and exclusively reserved to WWE for exploitation as it shall determine in its sole discretion subject to the following limitations: (i) WWE shall not license any Special Program in the Territory for pay, free, pay-per-view, SVOD, VOD or other television exhibition for a period of 14 days from the first showing of such Special Program hereunder; and (ii) in the event that WWE wishes to license to a third party the distribution of the Special Programs in their entirety via (a) the Internet (i.e., other than through WWE.com), or (b) via mobile or broadband, it will provide Operator notice thereof and, for a period of 30 days from such notice shall negotiate exclusively with Operator with respect to such rights, it being agreed that nothing herein shall obligate any party to enter into any agreement with respect to such rights.

3.0     TERMS RELATING TO ALL PROGRAMS: The Agreement shall apply only to the Programs specified and designated according to title, date and time on the Program Schedule set forth in Schedule A attached hereto.  Except in the case of WWE's non-delivery of the Programs, an event of Force Majeure or the circumstances as described in clause 4.3 below, the first such transmissions shall be made, in each instance, during the week of the first presentation of the Event in the United States.  A replay feed and/or any encore presentation of any Program shall be made only as provided in Schedule A.

3.1     If for whatever reason, an alternative program is produced by WWE of comparable quality, substance and duration to the Programs ("Alternative Program") during the Term hereof, and WWE offers such Alternative Program to Operator, such Alternative Program shall be automatically substituted in lieu of the Program which it is replacing.

3.2     The Programs themselves may promote, market and/or advertise WWE's World Wrestling Entertainment brand; its superstars and performers; its professional wrestling events; its other television, pay-per-view and other programming; its sponsors and advertisers; its Internet site and its contents; its authorized merchandise; any of its promotions; and/or any of its other products

or services; all as an integral part of the Program's content. WWE shall telefax a general rundown for each Program to the Operator in a timely manner prior to the scheduled time of broadcast of the Program; provided, however, WWE shall not be responsible for any compliance or noncompliance by the Operator of any regulatory requirements governing Operator's operations.

3.3     WWE shall deliver a signal feed for each Program through a mutually agreed satellite transponder between the parties (such signal feed to be of a first class technical quality suitable for relay in accordance with this Agreement and for subsequent transmission authorized under this Agreement) and Operator shall procure that transponder shall relay such Programs to Operator by satellite. WWE's delivery obligation shall be complete upon WWE's delivery of the signal feed carrying the Programs to transponder. Operator shall pay all costs associated with the delivery of the Programs including, without limitation, any "uplink", "space" and "downlink" costs.

3.4     WWE shall immediately be excused from delivery of a Program to Operator upon the occurrence of any of the following:

> (a) An order or ruling from a governmental or quasi-governmental agency that requires the cancellation or postponement of an Event;
>
> (b) the participants for an Event fail, refuse or are unable to participate in such Event, or are disqualified from participating in an Event for reasons beyond WWE's reasonable control;
>
> (c) WWE, in its reasonable discretion, determines that the transmission, cablecast and/or exhibition of the Programs would infringe upon the rights of others and subject Operator to material liability, or otherwise subject WWE to material liability;
>
> (d) the Event is delayed or prevented from occurring on the scheduled date or at the scheduled time for any reason beyond WWE's reasonable control;
>
> (e) the generation and transmission of the television signal carrying the Programs is delayed or prevented for any reason (including, without limitation, weather conditions, technological issues or equipment problems) beyond WWE's reasonable control;
>
> (f) any Force Majeure (as defined below); or
>
> (g) WWE, in its sole discretion, determines not to hold the Event or not to exhibit the Program in the United States.
>
> Provided that:
>
> > (i)     WWE shall give notice to Operator of such an occurrence;

(ii)   Operator's Subscribers may be refunded all or part of the amount charged and/or paid for such Program (To that end, any such refunds or reimbursements and the administration thereof shall be the sole and absolute responsibility and expense of Operator);

(iii)   Operator shall not be required to pay WWE for any such cancelled Program; and

(iv)   If WWE reschedules such Event/Programs during the Term, Operator shall have the right to exhibit such Program in the Territory and shall be entitled to do so under the same terms hereunder but on an alternate agreed upon date and time.

Note:   In the event WWE is excused from delivery of a Program due to any of the foregoing reasons, it is understood and agreed that WWE shall only be excused from delivery in respect of that Program(s) and this Agreement will continue in full force and effect in respect of all other Programs during the Term.

3.5     Operator shall transmit, cablecast and/or exhibit the Programs (including the Replays thereof), in their entirety, including all titles, credits and copyright notices on the Programs in the exact form delivered to Operator by WWE.

3.6     Save for the purpose of complying with applicable censorship, legal or regulatory requirements within the Territory, Operator shall not cut, edit, add to, delete from or otherwise revise in any fashion any portion of any of the Programs without the advance written approval of WWE. In the event that Operator needs to revise any of the Programs for the purpose of compliance with applicable censorship, legal or regulatory requirements in the Territory, Operator shall consult WWE as soon as practicable.

3.7     Operator shall not delay or reschedule the transmission of any Program, and shall not retransmit any Program at any time other than as designated in the Program Schedule set forth in Schedule A.  If Operator experiences or encounters technical difficulties beyond its reasonable control in the reception and/or exhibition of the Programs, it must give WWE written notice of the technical difficulties within five (5) business days and request an extension conditioned upon WWE's approval, to permit exhibition of the Programs on an alternate date or at an alternate time.

3.8     Operator and WWE shall honor all copyrights with respect to the Programs and shall not knowingly infringe anyone's proprietary interests, copyrights, and/or trademarks in the Programs or knowingly permit anyone else to do so during the exhibition of the Programs.

3.9     Operator, at its sole cost and expense, will endeavor to compile lists of and numbers of Subscribers for each Pay-Per-View Program, and ratings information relating to the Special Programs, if said information is available, and such other reasonable and necessary information and transmission statistics as requested by WWE (but excluding for the avoidance of doubt customer

names or addresses) and Operator shall forward such lists and information to WWE on a monthly basis.

      3.10    Operator shall use reasonable efforts to employ "State of the Art" security systems to prevent theft, pirating, copying, duplication or unauthorized exhibition of the Programs. Upon reasonable notice, WWE or its representatives may visit the premises of Operator in order to observe such security systems and to ensure the proper utilization of this Agreement in accordance with the terms of this Agreement.

      3.11    WWE shall not be responsible for, or charged with, any fees or charges for equipment necessary to receive, descramble and exhibit the Programs including, without limitation, all reception and downlink equipment, all decoding equipment, all transmission and/or all other equipment used by Operator to exhibit the Programs. Licensee shall indemnify and hold WWE harmless from any and all claims relating to intellectual property infringement relating to the Distribution System.

      4.0    TERM:

      4.1    The term of this Agreement shall commence on February 28, 2007, and end on December 31, 2011, unless earlier terminated in accordance herewith (the "Term").

      4.2    This Agreement will terminate automatically upon the happening of the following events:

> (i) Insolvency or bankruptcy of either party or filing of a voluntary petition in bankruptcy or making an assignment for the benefit of creditors or consenting to the appointment of a trustee or receiver by either party;

> (ii) A trustee or receiver is appointed for a substantial part of the properties of a party hereto and the appointment is not dismissed within sixty (60) days; or

> (iii) Bankruptcy reorganization, arrangement or liquidation proceedings are instituted by or against a party, and if against a party are consented to or remain undismissed for sixty (60) days.

      Except as set forth above or elsewhere in the Agreement, a party will have thirty (30) days to cure a default under this Agreement (or if such default cannot be reasonably cured within thirty (30) days, such party must commence to remedy such default within such 30-day period and diligently pursue the same until corrected) after receipt of written notice from the other party, which notice shall include the specifics of such default. The failure to cure such default within the thirty (30) day cure period shall constitute a material breach hereunder, whereby the non-breaching party may proceed to immediately terminate this Agreement upon expiration of the then applicable cure period.

      4.3    If Operator fails to complete the exhibition of one or more Programs in violation of this Agreement, such failure shall not operate to extend the Term of this Agreement. All provisions of this Agreement which expressly or by necessary implication survive the expiration or earlier

termination of the Term shall do so, including, but not limited to, any representations and warranties set forth by the parties herein.

4.4     Upon the expiration or earlier termination of this Agreement, Operator shall immediately and permanently discontinue using, in any manner whatsoever, the Programs and/or any of the intellectual property of WWE including but not limited to the names, images and likenesses of Talent, names and logos of the Event and any advertising marketing or promotional materials created pursuant to this Agreement. Termination or non-renewal of this Agreement shall not release either party hereto from obligations or liabilities, which had previously accrued or have become due. Within the sixty (60) days following the termination of this Agreement, each party shall pay all amounts due and owing to the other party with respect to the Programs delivered to and transmitted by Operator as of the date of termination.

5.0     PPV LICENSE FEES: For the Pay-Per-View Programs, Operator shall pay WWE a "License Fee" for each cablecast, broadcast, exhibition, replay or encore showing of the Pay-Per-View Programs (provided, that, to the extent that a replay or encore showing is included in the order for a Pay-Per-View Program at no additional cost to the viewer, Operator shall not be required to double count such price in its calculation of Gross Video Revenue for purposes hereof) pursuant to this Agreement in an amount equal to Fifty (50%) of Gross Video Revenue, as defined below. The License Fee represents the gross amount due to WWE before deduction of any applicable Withholding Taxes. "Gross Pay-Per-View Revenue" shall mean for each Pay-Per-View Program the greater of (x) the aggregate amount charged (excluding any Federal or Provincial Taxes or levies to the viewer) to all Subscribers for such Pay-Per-View Program or (y) the product obtained by multiplying (a) the SRP for such Pay-Per-View Program times (b) the number of Operator's Subscribers for such Pay-Per-View Program, in each of cases (x) or (y), whether or not such amounts are collected by Operator less refunds for (i) Cancellations of an order by the Operator's Subscriber which are received by the Operator or its agent prior to the commencement of the Pay-Per-View Program at issue or (ii) Failure to deliver and/or transmit the Pay-Per-View Programs through an act or error of WWE, as set forth in the Agreement or because of an event beyond the reasonable control of Operator such as a Force Majeure. At all times all License Fees and all other monies due to WWE relating to the Pay-Per-View Programs, whether collected directly by the Operator or by any sub-agents to the extent allowed hereby, shall be held in trust for the benefit of WWE in a separate and distinct escrow account until paid out by Operator as required hereby.

5.1     Operator shall not charge any unique or unusual fee for the Pay-Per-View Programs, in addition to the actual retail price of the Pay-Per-View Programs set forth in Exhibit A, which is not regularly charged with respect to other similar events exhibited by Operator. Operator acknowledges the suggested retail price (the "SRP") for each Pay-Per-View Program, as listed on Schedule A attached hereto. WWE, in its discretion, may change the SRP of any Pay-Per-View Program(s) on 30 days' notice to Operator. The parties acknowledge that the SRP are suggested only and there is no obligation on Operator to comply with the suggestion. The Pay-Per-View Programs shall not be offered and/or sold in packages with other pay-per-view programming, unless such package is approved in advance by WWE.

6.0     SPECIAL PROGRAM LICENSE FEES:  For the license contained herein for the Special Programs, Operator shall pay WWE an aggregate of Four Hundred Fifty One Thousand

Seven Hundred Eighty Two and 70/100 US Dollars ($451,782.70), payable in accordance with the payment schedule set forth on Exhibit A.

7.0     TAXES: Operator shall pay all applicable federal, provincial and local taxes for the licensing, transmission, cablecast, exhibition and/or sale of the Pay-Per-View Programs within the Territory, including without limitation GST sales, use and other similar taxes, excise taxes, franchise taxes and other special taxes that may apply to the exhibition of the Programs.  Notwithstanding the foregoing, this Section 7.0 does not apply to WWE's obligation to pay its own federal, state and/or local income taxes as required by law.

7.1     In furtherance and not in limitation of Section 7.0 above, there shall be no deduction from the amounts paid to WWE hereunder for taxes, fees, assessments, or other expenses of any kind.  It shall be Operator's sole responsibility at its expense to obtain the approval of any foreign authorities; to take whatever steps may be required to effect the payment of funds; and to minimize or eliminate the incidence of taxes, fees, or assessments which may be imposed. Notwithstanding the foregoing provision, if any country imposes a tax against WWE with respect to the amounts payable to WWE by Operator under this Agreement; and such tax is paid by Operator on behalf of WWE; and such tax is an income tax as to which a foreign tax credit is allowed to WWE, Operator may deduct the amount of such withholding tax from the amounts owing to WWE provided the appropriate documentation is delivered to WWE evidencing the deduction and WWE is allowed a foreign tax credit under the then current United States Code and/or other applicable laws.  Operator shall supply WWE with all the necessary tax forms to effect the foregoing deduction in a manner that allows WWE to avail itself of an appropriate foreign tax credit allowance.

8.0     PPV ACCOUNTING STATEMENTS: Operator shall prepare, keep and maintain complete and accurate books and records, pertaining to each Pay-Per-View Program and the Subscribers relative thereto (and which for the avoidance of doubt shall not include customer names or addresses), which books and records shall, at a minimum, consist of the following:

(a)  a listing of all Subscribers for each Pay-Per-View Program, which listing must agree in total with the information set forth in the Final Accounting Statement (as defined below) submitted by Operator to WWE for each Pay-Per-View Program.

(b)  a listing of regular customer billings for the period (the most recent fiscal quarter) during which the Subscribers were billed for being able to watch the Pay-Per-View Programs.

(c)  all such books and records are to be kept and maintained at Operator's principal place of business for a period of at least twenty-four (24) months after Operator's transmission of the last Pay-Per-View Program under this Agreement, which will be available for review by WWE pursuant to the terms of clause 8.3 below.

8.1     Within three (3) days after WWE's delivery of each Pay-Per-View Program, Operator by telephone or by fax shall provide to WWE a preliminary estimate of the information to be entered on the Final Accounting Statement for such Pay-Per-View Program.

8.2    Within thirty (30) days after WWE's delivery and transmission of each Pay-Per-View Program to Operator, Operator shall:

(a)    complete a Final Accounting Statement relative to that Pay-Per-View Program in the form set forth in Schedule B, and

(b)    forward such Final Accounting Statement for that Pay-Per-View Program to WWE and make payment of the License Fee in accordance with the provisions of Section 9 herein.

8.3    At any time during the Term and for a period of twenty-four (24) months thereafter, upon fourteen (14) days advance written notice, WWE, through its representatives and/or agents, ("Auditors") may conduct an accounting or audit of the operator's books and records to ensure that the Final Accounting Statement for each such Pay-Per-View Program is complete and contains the customer billing account numbers (not to include the customer name or address) of the Subscribers who ordered (and did not cancel) the Pay-Per-View Programs. The Audit shall be conducted during normal business hours of Operator. The Auditors may randomly select customer billings from the Operator's entire customer billing records for the period of months in which the Pay-Per-View Programs were billed to determine whether all Subscribers ordering the Pay-Per-View Programs appear on the list supporting its Final Accounting Statement. In addition, Operator shall cause all its affiliates and appropriate operating systems to provide access to all relevant documentation for such audit. The Auditors shall not retain any Operator's customer billing records. The cost of the Audit will be borne by WWE except as provided in Section 8.4. Notwithstanding anything herein to the contrary, unless directed by applicable law, for litigation purposes or as otherwise agreed, it is hereby understood that the parties shall not disclose any terms of such an audit to any third party either during or after the Term, other than to WWE representatives, attorneys, and/or agents.

8.4    If an audit reveals that Operator has substantially misrepresented or made or any material error with respect to any item related to the information set forth on a Final Accounting Statement or otherwise, in addition to any other rights and remedies WWE may have, WWE shall be entitled to recover all costs and expenses incurred to conduct its audit and to enforce the collection of such additional monies due.

9.0    LICENSE FEE PAYMENT: Within thirty (30) days after WWE's delivery of each Pay-Per-View Program, or on the payment date provided in Schedule A for Special Programs, Operator shall pay any and all License Fees to WWE, as follows:

9.1    Any License Fee which is not received, when due and payable, shall bear interest at the rate of one and one-half percent (1 1/2%) per month computed from the original due date until paid; provided, however, that if the foregoing rate shall be in excess of the maximum permitted by law in the jurisdiction where such debt accrues, then such interest rate shall be adjusted downwards to the maximum permitted by applicable law. WWE's acceptance of any payment after its due date shall not constitute a waiver by WWE of any of its rights hereunder.

9.2    (a) Payment of License Fee, or any portion thereof, in excess of U.S. One Hundred Thousand (U.S. $100,000.00) shall be made by Wire Transfer as follows:

JP Morgan Chase
1166 Avenue of the Americas, 15th Floor
New York, NY 100368

ABA Routing #: 021000021
Account #: 323-415660
Customer Name: World Wrestling Entertainment, Inc.

NOTE: Must specify the exact dollar amount to be received.

b)     Payments of less than U.S. $100,000.00 shall be made by means of a check issued to World Wrestling Entertainment, Inc. shall be delivered via overnight delivery to WWE at the following address:

> World Wrestling Entertainment Inc.
> 1241 East Main Street
> Stamford, CT 06902

> Attention: George Barrios, Chief Financial Officer

     10.0    ADVERTISING AND MARKETING: Operator shall work with WWE and shall use every reasonable effort to maximize the total buys and total revenue for exhibition of each Pay-Per-View Program and to specifically promote each Pay-Per-View Program.

     10.1    As to all such marketing, advertising, promotional and publicity materials, Operator shall comply with WWE's instructions respecting sequence, type style, relative size and prominence, and content of screen and advertising credits and Operator shall not in any way change the credits contained in any material furnished by WWE.

     10.2    Operator shall not use the name and/or likeness of any character, person or entity appearing in, or connected with any Event or Program for any purpose other than advertising the Programs as provided herein. Furthermore, Operator shall not use the name and/or likeness of any character, person or entity appearing in or connected with any Event or Program so as to constitute an endorsement or testimonial, either expressed or implied, of any party, product, service or commercial venture, including that of the Operator, except with the prior written approval of WWE.

     10.3    Operator shall not use WWE's name, trademark, servicemark or logo, or the name, trademark, servicemark or logo of any person or entity appearing in a Program, in any manner whatsoever, other than as specifically furnished in publicity and promotional materials provided or approved in writing by WWE.

     10.4    Operator shall not transmit, exhibit, circulate, or otherwise use any of the marketing, advertising, promotional or publicity materials furnished pursuant to this Section 10 after exhibition of the relevant Programs, without WWE's prior written consent.

10.5    Operator shall not use or permit others to use any of the marketing, advertising, promotional or publicity materials furnished pursuant to this Section 10 for joint advertising campaigns of the Programs and/or for any other programming without WWE's prior written consent; nor shall Operator engage in or permit others to engage in any such joint advertising, promotion or publicity arrangements or campaigns.

10.6    Operator shall not publish or distribute its own promotional, publicity, advertising or display materials for the Programs without WWE's prior written consent.  Operator may express mail or fax proposed materials to the attention of Andrew Whitaker, President, WWE International or his designee, c/o of WWE for approval.

10.7    Notwithstanding anything contained herein to the contrary, any and all materials to be used in advertising, promoting or marketing any Program or any other WWE event shall be subject to the prior written approval of WWE.

11.0    <u>BEST EFFORTS</u>: Operator shall use best efforts to exploit the Programs in the Territory and Operator will not discriminate against any of the Programs in favor of any other pro-gramming which it exhibits.  In addition, subject to WWE complying with its obligations herein, Operator shall use best efforts to ensure that the signal received by each Subscriber shall be equal in quality to the signal of other cable television channels regularly received by their subscribers within the Territory.

11.1    Operator shall exhibit the Programs viewers with one-way and two-way cable communications service; and shall not discriminate against one-way subscribers by refusing to exhibit the Programs to them unless they subscribe to and/or pay for any additional package or service.

11.2    In order to maximize sales of the Pay-Per-View Programs, the Special Programs and WWE's other goods and services, and to prevent other producers and distributors from trading upon or appropriating WWE's efforts, Operator shall not advertise, market, sell, transmit, cablecast and/or exhibit any programming featuring wrestling activities similar to those contained in the Programs.

11.3    If WWE hosts one of the Pay-Per-View Programs as a live Event in the Territory, WWE shall reserve the right, until the Event is sold-out, to black out the distribution of the Event from Operator's Distribution Services within a One Hundred Kilometer radius surrounding the site of the live Event (the "Blackout Territory"); provided that WWE shall give Operator at least sixty (60) days prior written notice of such blackout and the applicable Blackout Territory. In the event that WWE notifies Operator of a blackout, Operator shall be prohibited from exhibiting the applicable Event to subscribers located in the Blackout Territory until notice by WWE that the Event has sold out, which notice shall be given promptly by WWE if and when such sell out occurs.

12.0    <u>MUSIC PERFORMANCE RIGHTS</u>: With respect to each musical composition and/or sound recordings contained in the Programs, there shall be no clearance or rights payments due from Operator with respect to the use of the music in the Programs; provided, however, Operator shall be responsible to pay any musical societies in respect of performance licenses.

13.0    MUTUAL INDEMNIFICATION: (a) Each party hereby agrees to indemnify, defend and hold harmless the other parties, and its subsidiaries and affiliates and their respective officers, directors, employees, representatives and other agents, to the extent of any and all liability, claims, suits, actions proceedings, demands, judgements, damages, losses including, reasonable attorneys' fees and expenses arising out of its:

(i)    negligence, or intentional acts or omissions in performing its duties and obligations under this Agreement; or

(ii)    breach of the agreements, representations, covenants, warranties or obligations set forth herein.

(b)    The Indemnitor shall have no liability to indemnify the Indemnitee in respect of a claim for which the Indemnitee is indemnified by the Indemnitor pursuant to subclause (a) unless:

(i)    the Indemnitee shall as a condition precedent to its right to be indemnified under the terms of this Agreement, give the Indemnitor prompt notice in writing of any allegation or claim whether such claim is oral or in writing and shall give to the Indemnitor such information as the Indemnitor reasonably requires to investigate the matter so reported;

(ii)    the Indemnitee makes no admissions, compromises or settlements without the prior consent in writing of the Indemnitor;

(iii)    the Indemnitee shall, at the request of the Indemnitor, permit the Indemnitor or its authorized representative, at the Indemnitor's cost and expense, to take over and conduct the defense of settlement of all negotiations and litigation and shall give the Indemnitor all reasonable assistance; and

(iv)    the Indemnitor shall be entitled to claim indemnity or contribution at any time in the name of the Indemnitor from any party against whom the Indemnitee may have such rights.

(c)    In the event that the Indemnitee wishes to contest any third party claim pursuant to this clause (a) which, in the opinion of the Indemnitor, should be settled, then, with the consent of the Indemnitor, the Indemnitee may so elect, provided that the Indemnitor's liability in respect of any such claim shall not exceed the amount for which, but for such election, the claim could have been settled (provided that the Indemnitor notifies the Indemnitee of such amount on or prior to the giving of the consent) together with costs and expenses payable in accordance with clause (a) and incurred up to the date of election.

14.0    LIMITATIONS OF LIABILITY AND DAMAGES: Notwithstanding anything to the contrary herein, WWE shall not be liable to Operator for any indirect, incidental or consequential damages, including, without limitation, cost of capital, loss of earning, loss of profits, loss of business, or loss of commercial and financial opportunities.

15.0   FORCE MAJEURE: Except as explicitly set forth herein to the contrary, if WWE shall be prevented from delivering any of the Programs to Operator or if Operator shall be prevented from receiving and transmitting any of the Programs by reason of Force Majeure (as defined below), then such party, as the case may be, shall be excused from its failure to perform its obligations under this Agreement for as long as such "Force Majeure" remains in existence. "Force Majeure" shall mean any act of God, fire, flood, war, public disaster, or other calamity; a strike or labor difficulties; any governmental or quasi-governmental or regulatory commission or association enactment, decree determination or action, regulation or order; any court imposed injunction; or any other occurrence beyond such party's reasonable control which, despite their reasonable efforts, prevents the delivery and/or exhibition of any of the Programs. If the "Force Majeure" event remains in existence for more than sixty (60) days, either party may immediately terminate this Agreement upon written notice to the other party.

16.0   WARRANTIES OF WWE: WWE warrants, represents and agrees that:

(a)   WWE has the right to enter into this Agreement and to fully perform hereunder. The execution, delivery and performance of this Agreement by WWE has been duly authorized by all necessary corporate action; requires no consent or other action by or in respect of, or filing with, any governmental body, agency or official; does not violate, contravene or constitute a violation of the party's Certificate of Incorporation or By-laws or any agreement, judgment, or other instrument by which it is bound.

(b)   Neither the Programs nor anything contained therein (including, but not limited to, any music performing right and the title of the Pay-Per-View Program) or any advertising materials furnished by WWE to Operator does or will violate or infringe upon any rights of any kind or nature whatsoever, of any person or entity.

(c)   In order to enable Operator to broadcast and transmit the Programs, WWE will procure (or has procured) certain music clearances or licenses related to the Event or Programs other than performance licenses.

17.0   WARRANTIES OF OPERATOR: Operator warrants, represents and agrees that:

(a)   Operator has the right to enter into this Agreement and to fully perform hereunder. The execution, delivery and performance of this Agreement by Operator has been duly authorized by all necessary corporate action; requires no consent or other action by or in respect of, or filing with, any governmental body, agency or official; does not violate, contravene or constitute a violation of the party's Certificate of Incorporation or By-laws or any agreement, judgment, or other instrument by which it is bound;

(b)   Operator has and will maintain at all times during the Term, insurance consistent with industry standards; and

(c)   Operator will maintain any and all required licenses from the applicable regulatory bodies located within the Territory and/or any and all such other governmental agencies within the Territory at all times during the Term and will comply with all applicable governmental

laws, rules, regulations and orders in connection with the transmission and exhibition of the Programs hereunder.

18.0   RELATIONSHIP OF THE PARTIES: The parties to this Agreement are independent contractors and nothing contained in this Agreement shall be deemed to constitute either of the parties as a joint venture, a partner or as an agent of the other.  Neither party shall hold itself out in any manner contrary to the terms of this Agreement and neither party shall become liable by reason or any representation, act or omission of the other contrary to the provisions of this Agreement.

19.0   BINDING EFFECT; BENEFITS: This Agreement shall be binding upon WWE and Operator and their respective successors and, subject to Section 20.0 assigns, and shall inure to their benefit.  Nothing in the Agreement, expressed or implied, is intended to or shall confer on any person other than the parties, or their respective successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

20.0   ASSIGNMENT: This Agreement and all rights granted herein are personal to each party; and neither party shall assign or delegate any right or obligation under this Agreement in whole or in part, by operation of law or otherwise.

21.0   WAIVERS: A waiver by either party of any breach of default by the other party under this Agreement shall not be construed as a continuing waiver of such breach of default, or a waiver of any other obligation under this Agreement.

22.0   NOTICES: All notices, statements, and other documents required to be given to WWE or Operator shall be given in writing and sent, either by personal delivery, by registered mail postage prepaid, or by fax to the following address:

> If to WWE to:
> World Wrestling Entertainment International Ltd.
> 26-28 Hammersmith Grove
> London, England  W67BA
> Attention:  Andrew Whitaker
>                     President, WWE International

| | |
|---|---|
| With a copy to: | World Wrestling Entertainment, Inc.<br>1241 East Main Street<br>Stamford, CT  06902<br>Attention:  Jared F. Bartie |
| If to Operator to: | Solar Entertainment Corporation<br>10/Flr Century Tower Building<br>100 Tordessillas St. corner HV dela Costa St.<br>Salcedo Village, Makati City<br>1227 Philippines |

Attention: Mr. Peter ChanLiong

(or such address as may be designated in writing by either party in a notice conforming with this Section 22). The date of such mailing, personal delivery or fax shall be the date of delivery of such notice.

23.0   CONFIDENTIALITY:  Other than as may be required by applicable law, government order or regulation; or by order or decree of any court of competent jurisdiction, or unless otherwise agreed to by the parties, neither WWE nor Operator shall publicly divulge or announce, or in any manner disclose to any third party, any of the specific terms and conditions of this Agreement including, without limitation, any of the License Fees and any of the information contained in the Final Accounting Statements rendered hereunder or the books and records referred to in Section 8.0 hereof.

24.0   APPLICABLE LAW; JURISDICTION: This Agreement and all matters and issues collateral thereto shall be governed by the laws of the State of Connecticut, U.S.A., with the same force and effect as is fully executed and to be fully performed therein. Each party hereto agrees that all disputes hereunder shall be brought exclusively in the Federal or State Courts sitting in the State of Connecticut, and each party agrees to submit itself to such exclusive jurisdiction and agrees not the assert any defense as to such choice of forum.

25.0   SEVERABILITY: Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement, or affecting the validity or enforceability of any of the terms or provision of this Agreement in any other jurisdiction.

26.0   SECTION AND OTHER HEADINGS: The section and other headings contained in the Agreement are for reference purposes only and shall not be deemed to be part of this Agreement nor affect the meaning or interpretation of this Agreement.

27.0   ENTIRE AGREEMENT: This Agreement (including the attached Schedules and Addenda, if any) constitutes the entire agreement among the parties with respect to the Programs during the Term and supersedes all prior agreements, understandings and arrangements, oral or written, between them with respect to the subject matter of this Agreement.  Furthermore, this Agreement may not be changed or amended except in writing making specific reference hereto and signed by both parties.

28.0   EXECUTION IN COUNTERPARTS: This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

29.0   EQUITABLE REMEDIES:   Operator acknowledges and agrees that any breach or threatened breach by it of the provisions of this Agreement would cause substantial harm to be suffered by WWE and may not be adequately remedied by money damages.  Therefore, without limiting any other remedy, legal or equitable, Operator further acknowledges and agrees that, in the

event of any breach or threatened breach of any Section of this Agreement by Operator, WWE shall be entitled to injunctive or other equitable relief, in addition to any other remedies available at law or in equity.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

WORLD WRESTLING ENTERTAINMENT, INC.

BY: _____

Print Name:    ANDREW WHITAKER

Title:    EVP, INTERNATIONAL

Date:    2/25/10

SOLAR ENTERTAINMENT CORPORATION

BY: _____

Print Name:    Peter Chan Liong

Title:    Chief Operating Officer

Date:    January 13, 2010

**SCHEDULE A**
**PAY-PER-VIEW PROGRAMS**

| EVENT NAME | DATES | SUGGESTED RETAIL PRICE |
|---|---|---|
| New Year's Revolution | January 2007 | The Suggested Retail Price shall be _____ |
| Royal Rumble | January 2007<br>January 2008<br>January 2009<br>January 2010<br>January 2011 | The Suggested Retail Price shall be _____ |
| No Way Out | February 2007 | The Suggested Retail Price shall be _____ |
| WrestleMania | March/April 2007<br>March/April 2008<br>March/April 2010<br>March/April 2011 | The Suggested Retail Price shall be _____ |
| Backlash | April 2007 | The Suggested Retail Price shall be _____ |
| Judgment Day | May 2007 | The Suggested Retail Price shall be _____ |
| One Night Stand | June 2007 | The Suggested Retail Price shall be _____ |
| Vengeance | June 2007 | The Suggested Retail Price shall be _____ |
| The Great American Bash | July 2007 | The Suggested Retail Price shall be _____ |
| SummerSlam | August 2007<br>August 2008<br>August 2010<br>August 2011 | The Suggested Retail Price shall be _____ |
| Survivor Series | November 2008<br>November 2010<br>November 2011 | The Suggested Retail Price shall be _____ |

The PPV Events shall be replayed within one (1) week after their original broadcast in the Territory. All such replays shall be at the same suggested retail price.

## SPECIAL PROGRAMS

"Special Programs" shall mean the following WWE programming titles broadcast in sequential, numerical episodic order as further set forth in the attachment hereto:

For 2007:  Unforgiven, No Mercy, Cyber Sunday and Armageddon.

For 2008: No Way Out, Backlash, Judgment Day, One Night Stand, Vengeance, Great American Bash, Unforgiven, No Mercy, Cyber Sunday and Armageddon.

For 2009:  No Way Out, WrestleMania 25, Backlash, Judgment Day, Extreme Rules, The Bash, Night of Champions, SummerSlam, WWE Breaking Point, Hell in a Cell, WWE Bragging Rights, Survivor Series and Armageddon.

For 2010:  No Way Out, Backlash, Judgment Day, Extreme Rules, The Bash, Night of Champions, WWE Breaking Point, Hell in a Cell, WWE Bragging Rights, Armageddon.

For 2011:  No Way Out, Backlash, Judgment Day, Extreme Rules, The Bash, Night of Champions, WWE Breaking Point, Hell in a Cell, WWE Bragging Rights, Armageddon.

During the Period of Agreement, Operator shall pay to WWE a license fee in the amount of Seven Thousand Seven Hundred US Dollars ($7,700.00) per episode of the Special Programs in Year 1; Eight Thousand Five Hundred Forty Seven US Dollars ($8,547.00) per episode of the Special Programs in Year 2; Nine Thousand Four Hundred One and 70/100 US Dollars ($9,401.70) per episode of the Special Programs in Year 3 (except for WrestleMania 25 which is Ten Thousand Six Hundred Eighty Four US Dollars ($10,684.00) per episode); Ten Thousand Three Hundred Forty One and 87/100 US Dollars ($10,341.87) per episode of the Special Programs in Year 4; Ten Thousand Eight Hundred Fifty Eight and 96/100 US Dollars ($10,858.96); or an aggregate of Four Hundred Fifty One Thousand Seven Hundred Eighty Two  and 70/100 US Dollars ($451,782.70) payable in accordance with the following schedule:

| DUE DATE | | AMOUNT |
|---|---|---|
| Upon execution | | US $146,581.30 |
| On or before September 15, 2007 | PAID | US $15,400.00 |
| On or before November 15, 2007 | PAID | US $15,400.00 |
| | | |
| On or before March 15, 2008 | PAID | US $17,094.00 |
| On or before May 15, 2008 | PAID | US $17,094.00 |
| | | |
| On or before November 15, 2009 | | US $28,205.10 |
| On or before March 15, 2010 | | US $20,683.74 |
| On or before May 15, 2010 | | US $20,683.74 |
| On or before July 15, 2010 | | US $20,683.74 |
| On or before September 15, 2010 | | US $20,683.74 |

On or before November 15, 2010      US $20,683.74

On or before March 15, 2011      US $21,717.92
On or before May 15, 2011      US $21,717.92
On or before July 15, 2011      US $21,717.92
On or before September 15, 2011      US $21,717.92
On or before November 15, 2011      US $21,717.92

**TOTAL**      US $451,782.70

| Program | Channel | Timeslot |
| --- | --- | --- |
| Domestic Raw | Jack TV | Wednesday, 9:00 PM |
| International Raw | RPN9/CS9 | Saturday, 10:00 PM |
| Domestic SmackDown | Jack TV | Sunday, 9:00 PM |
| International SmackDown | RPN9/CS9 | Saturday, 11:00 PM |
| Domestic ECW | Jack TV | Thursday, 10:00 PM |
| International Bottom Line | Jack TV | Sunday, 6:00 PM |
| International AfterBurn | Jack TV | Monday, 6:00 PM |
| WWE Experience | Jack TV | Tuesday, 6:00 PM |
| Vintage Collection | Jack TV | Friday, 9:00 AM |
| Specials | Jack TV | Monday, 9:00 PM |
| PPVs | Solar Sports | |

C:\Documents and Settings\kmartino\Local Settings\Temporary Internet Files\OLK12F\Solar Philippines (07-11) clean 9-17-09.doc

- 19 -

## SCHEDULE B
## FINAL ACCOUNTING STATEMENTS

The following is the name and telephone number of the person to contact regarding the information to be contained on the Final Accounting Statement.

NAME: _____

TITLE: _____

TELEPHONE: _____

**REMINDER:   INSERT FINAL ACCOUNTING STATEMENT FORM
FOLLOWING THIS PAGE**